# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| JASON TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:14-cv-01682-WTL-MJD |
| ) | |
| KEITH ALBERT Officer, ) | |
| JEAN DEDDISH Officer, ) | |
| ) | |
| Defendants. ) | |

**Entry Discussing Unopposed Motion for Summary Judgment**

Plaintiff Jason Taylor alleges that on July 4, 2012, he was subjected to an unreasonable search by Indianapolis Metropolitan Police Department ("IMPD") Officers Keith Albert and Jean Burkert (identified as Jean Deddish in the Complaint) in violation of his Fourth Amendment rights. Specifically, Officers Albert and Deddish allegedly searched Mr. Taylor's buttocks in a public place. The defendants seek resolution of this action through summary judgment. They argue that they are entitled to judgment as a matter of law because the searches they conducted incident to Mr. Taylor's arrest were reasonable due to their suspicion that Mr. Taylor was concealing weapons or contraband that could be smuggled into a detention center.

For the reasons explained below, the defendants' unopposed motion for summary judgment [dkt. 48] is **granted.**

1

### I. Standard of Review

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The key inquiry, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial ... against the moving party." *Celotex,* 477 U.S. at 330.

Mr. Taylor's failure to oppose the motion for summary judgment has a particular consequence, which is that he has admitted the truth of the defendant's statement of material facts for purposes of the Court acting on the motion for summary judgment. See *Johnson v. Gudmundsson,* 35 F.3d 1104, 1108 (7th Cir. 1994). This does not alter the standard for assessing a Rule 56 motion, but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn.

### II. Undisputed Material Facts

On July 4, 2012, Indianapolis Metropolitan Police Department officers were dispatched to the intersection of Clifton Street and Congress Avenue to investigate a stabbing incident.

Defendant Officer Burkert was the responding officer. Officers Albert, James Hurt, and Jeremy Lee assisted Officer Burkert in her investigation.

During the course of their investigation, the officers were informed that the suspect responsible for the stabbing was at 1056 West 31st Street, Indianapolis, Indiana. Officer Albert was familiar with this address because it was located near a dope house in a high crime area where he regularly responded to shots fired runs. Officer Hurt was also familiar with this address and knew that it was in a high crime area. He had previously responded to numerous runs concerning drugs, guns, and violent crime near 1056 West 31st Street.

The officers walked to that address and observed Mr. Taylor sitting on the porch of what appeared to be an abandoned house. Defendant Officer Albert then made contact with Mr. Taylor and learned that he did not have identification on him. Mr. Taylor identified himself as Jason Taylor. Officer Albert then gathered personal information about Mr. Taylor to verify his identity.

As Officer Albert spoke with Mr. Taylor, the officers detected a strong smell of marijuana. According to Officer Burkert, the smell of marijuana was overwhelming. Officer Albert identified the smell of raw marijuana based upon his training and experience as a K9 handler and drug recognition expert. Officer Hurt noticed that the smell was strongest near Mr. Taylor and dissipated the further that he got from Mr. Taylor.

After gathering Mr. Taylor's personal information, Officer Albert used his radio to call a dispatch operator and verify Mr. Taylor's identity. In doing so, he learned that Mr. Taylor had been convicted of cocaine dealing, unlawful possession of a firearm by a serious violent felon, criminal recklessness, cocaine possession, resisting arrest, and carrying a handgun.

After learning about Mr. Taylor's convictions, Officer Albert conducted a pat down search. Officer Albert found rolling papers and a scale commonly used to weigh narcotics in Mr. Taylor's pockets.

After Officer Albert discovered these items, Officer Hurt conducted a second pat down search. During this search, Officer Hurt noticed that Mr. Taylor was standing "a little funny." Therefore, he asked Mr. Taylor to broaden his stance and he shook Mr. Taylor's pants leg. When he did so, he observed a baggie of marijuana fall out of Mr. Taylor's pants. Officer Hurt believed that this baggie of marijuana shifted loose and fell from Mr. Taylor's buttocks when Mr. Taylor broadened his stance.

After the baggie of marijuana was discovered, Officer Albert placed Mr. Taylor in handcuffs and read him his Miranda rights. Officer Albert then conducted a search incident to Mr. Taylor's arrest. When he did so, he noticed that Mr. Taylor was clenching his butt cheeks. Officer Albert knew, based upon his training and experience, that it is common for suspects to hide narcotics and contraband in or around their buttocks to evade detection or arrest. Officer Albert had also learned through training and experience that it is common for people who possess drugs to also possess weapons. Officer Albert's suspicion that Mr. Taylor had contraband hidden in or around his buttocks was based upon Mr. Taylor's behavior and possession of the baggie of marijuana, rolling papers, and a scale.

Officer Albert concluded that Mr. Taylor posed a threat to officers and others in the vicinity of his arrest. He also concluded that Mr. Taylor posed a risk to anyone he might encounter after he was transported from the scene. He knew that Mr. Taylor "had been convicted of crimes that indicated that he was a violent felon who had previously resisted arrest, committed criminal

4

recklessness, and possessed weapons." (Albert Aff. ¶ 22.) Thus, he believed that "[i]t was important to identify whether Mr. Taylor was hiding a weapon in his butt cheeks because his hands were cuffed near his butt cheeks and he could gain access to items that he was hiding in his butt cheeks. If he was hiding a weapon in his butt cheeks, he could use that weapon to seriously injure or kill someone at the scene of his arrest, during his transportation, or upon arrival at the Arrestee Processing Center." (Albert Aff. ¶ 23.)

Similarly, Officer Albert also knew that Mr. Taylor had been convicted of possession of cocaine. Thus, he believed that it was important to identify whether he was hiding narcotics in his butt cheeks because his hands were cuffed near his butt cheeks and he could gain access to items he was hiding in his butt cheeks. If he was hiding drugs in his butt cheeks, he could smuggle those drugs into jail or drop them where others (such as children or animals) might unknowingly be exposed to that dangerous substance.

Since he believed that Mr. Taylor posed a risk to people during his arrest and transportation, Officer Albert decided to take Mr. Taylor between two houses to conduct a more thorough search. This area was private and not visible to the public.

Officer Albert noticed that Mr. Taylor was clenching his butt cheeks and walking like a duck as they walked between the houses. Prior to Mr. Taylor's arrest, Officer Albert had encountered suspects who walked in this manner and discovered that those suspects were hiding contraband.

Once they were between the houses, Officer Albert adjusted Mr. Taylor's pants and attempted to identify whether he was hiding anything in or around his buttocks. Officer Albert noticed that Mr. Taylor kept his butt cheeks clinched. He ordered Mr. Taylor to stop clenching his

5

butt cheeks. When Mr. Taylor refused to comply, they walked back to the front of the house at 1056 West 31st Street.

At this time, Officer Albert still believed that Mr. Taylor was hiding something in his butt cheeks and that he posed a risk to people in the immediate vicinity. He shared his belief with Officer Burkert. Officer Albert was familiar with Officer Burkert's training and experience with searches, because "she was one of the officers involved in [his] training when [he] joined the IMPD." (Albert Aff. ¶ 29.) Prior to Mr. Taylor's arrest, Officer Burkert had spent five and a half years working for the Marion County Sheriff's Department Jail Division. For two of those years, she processed all males coming into the jail from the prisons. This involved strip searching approximately 20 to 25 men at a time. Based upon her training and experience, she knew how to identify whether suspects are hiding contraband in or around their buttocks. If she discovered that Mr. Taylor was hiding contraband in or around his buttocks, she would have sent Mr. Taylor to the hospital and would not have removed contraband.

Officer Burkert asked Mr. Taylor for permission to conduct a search to identify whether he was hiding contraband in or around his buttocks and Mr. Taylor gave her permission to do so. She offered to check to see if Mr. Taylor was hiding contraband because she had a good repartee with Mr. Taylor and he was getting along with her. He indicated that he felt more comfortable with her doing the search. Her intent was not to humiliate Mr. Taylor. Her intent was to make sure he did not have contraband that could be smuggled into jail or hidden to evade arrest. Officer Burkert, Officer Albert, and Mr. Taylor "then walked between the houses where [she] adjusted Plaintiff's pants and attempted to identify if he was hiding something in his butt cheeks."

6

When Officer Burkert searched Mr. Taylor, she pulled the back of his pants away from his body and observed the top of his buttocks. Mr. Taylor was clothed at all times during this search. Officer Burkert did not pull his pants or underwear all the way down. Mr. Taylor's shirt was not hiked up. She never spread his butt cheeks or attempted to put a finger in or around his buttocks.

Officer Burkert informed Officer Albert that she did not see any contraband, walked back to the front of the house, and returned to her investigation of the reported stabbing. Officer Albert then walked Mr. Taylor to the front of his patrol car and began completing paperwork for Mr. Taylor's arrest.

As Officer Albert was completing his paperwork, Officer Hurt led Mr. Taylor from a standing position in front of the patrol car to a seated position on the curb next to 31st Street. At that time, there were no drugs or contraband located on the ground in front of the patrol car. After Officer Albert completed his paperwork, Mr. Taylor was transferred to the custody of the Marion County Sheriff's Department and transported from the scene. Officer Hurt then found a black bag on the ground directly in front of Officer Albert's patrol car where Mr. Taylor had previously been standing. This black bag contained individually wrapped packets of a brown substance in aluminum and a large chunk of a brown tar substance in a clear plastic bag. Based upon his training and experience, Officer Albert knew that this was a common way that people package narcotics and concluded that the bag contained heroin.

Officer Albert's observations of Mr. Taylor led him to believe that Mr. Taylor was hiding this black bag of heroin in his butt cheeks when he was searched on July 4, 2012. Officer Albert believed that Mr. Taylor hid this heroin in his butt cheeks to evade arrest. He also believed that this black bag was lying on the ground because Mr. Taylor had the opportunity to remove this bag

7

from his buttocks or to release this bag by unclenching his butt cheeks prior to being transported from the scene by the deputy.

### III. Discussion

Mr. Taylor alleges that the defendants violated his Fourth Amendment rights by conducting an unreasonable search. The defendants seek judgment as a matter of law arguing that the undisputed evidence reflects that Mr. Taylor was searched pursuant to a lawful arrest for possession of illegal drugs and there was no Fourth Amendment violation.

It is well settled that searches incident to a lawful arrest are reasonable under the Fourth Amendment. *United States v. Robinson*, 414 U.S. 218, 224 (1973). The Seventh Circuit has explained:

> *Robinson* establishes . . . that a police officer does not have to assess the likelihood that the individual arrestee is possessing a weapon or concealing evidence but may undertake a "full search" of an arrested person aimed toward the discovery of weapons, instruments of escape, and evidence that could otherwise be concealed or destroyed. . . . The Court did not suggest that a person validly arrested may be subject to any search the arresting officer feels is necessary.

*Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1269 (7th Cir. 1983). The Seventh Circuit has further clarified that officers "must have reasonable suspicion that a detainee is concealing contraband before they may conduct a strip search, and whether reasonable suspicion exists 'depends upon such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record.'" *United States v. Freeman*, 691 F.3d 893, 901 (7th Cir. 2012).

In this case, the defendants did not conduct a strip search. They did, however, view Mr. Taylor's buttocks in a private place between houses that was away from the public view. The search was not invasive and Mr. Taylor was never forced to take off his pants. For the reasons

explained below, the defendants had a reasonable suspicion that Mr. Taylor was hiding contraband which justified viewing Mr. Taylor's buttocks in a private place.

First, the defendants had evidence that suggested that Mr. Taylor may have stabbed someone earlier that night and Mr. Taylor was under arrest for possession of illegal drugs. In addition, the officers smelled the odor of raw marijuana, and had discovered drugs and drug paraphernalia on Mr. Taylor's person. *Freeman*, 691 F.3d at 901 ("Sometimes the nature of the charged offense by itself may supply enough suspicion to justify the search, and narcotics violations are the 'kinds of crimes . . . that might give rise to a reasonable belief that [an] arrestee was concealing an item in a body cavity[.]'") (internal citations omitted). Officer Albert also learned through training and experience that people who possessed drugs are often armed.

Next, Mr. Taylor's appearance and conduct following his arrest was suspicious. Mr. Taylor exhibited telltale signs that he was also concealing contraband in his buttocks. He was clenching his buttocks and walking like a duck after he was arrested on July 4, 2012. Finally, Mr. Taylor's prior arrest record furthered the defendants' reasonable suspicion. The defendants were aware of Mr. Taylor's violent criminal history when they conducted their searches. Officer Albert knew that Mr. Taylor had been convicted of cocaine dealing, unlawful possession of firearm by serious violent felon, criminal recklessness, cocaine possession, resisting arrest, and carrying a handgun. Mr. Taylor's criminal history was properly considered by the officer's in assessing the danger he posed to the public and officers.

Based on these circumstances, the defendants had reasonable suspicion (1) that Mr. Taylor was hiding weapons or contraband in or around his buttocks, (2) that he may have committed a violent crime that night, and (3) that he was a dangerous felon who was capable of harming people

at the scene of his arrest, during his transportation, or while incarcerated. This evidence establishes that the officers acted reasonably by observing Mr. Taylor's buttocks in a private place between two houses.

For all of these reasons, the officers who conducted the search had a reasonable suspicion, based upon the totality of the circumstances surrounding Mr. Taylor's arrest, that he was concealing weapons or contraband that if not discovered could be introduced into the Arrestee Processing Center. This search and its scope was "valid in order to find weapons and to search for and seize any evidence on the arrestee's person in order to prevent concealment and to preserve evidence for trial." *United States v. Thomas*, 512 F.3d 383, 387 (7th Cir. 2008).

## IV. Conclusion

The defendants did not violate the Mr. Taylor's Fourth Amendment rights and the defendant's unopposed motion for summary judgment [dkt. 48] is **granted.**

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 10/20/2015

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

JASON TAYLOR
129046
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 West 850 South
BUNKER HILL, IN 46914

All Electronically Registered Counsel

11